IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-619

Filed: 18 August 2020

Orange County, No. 16 JA 61

IN THE MATTER OF: I.K.

Appeal by respondents from order entered 22 March 2019 by Judge Samantha Cabe in Orange County District Court. Heard in the Court of Appeals 27 May 2020.

> *Stephenson & Fleming, LLP, by Deana K. Fleming, for petitioner-appellee Orange County Department of Social Services.*
>
> *Batch, Poore & Williams, PC, by Sydney Batch, for respondent-appellant mother.*
>
> *Vitrano Law Offices, PLLC, by Sean P. Vitrano, for respondent-appellant father.*
>
> *Parker Poe Adams & Bernstein L.L.P., by R. Bruce Thompson II, for Guardian ad Litem.*

ARROWOOD, Judge.

Respondent parents appeal from the trial court's Permanency Planning Order establishing a permanent plan of placement for their daughter. For the following reasons, we affirm.

## I.  Background

This appeal comes after multiple prior proceedings:  a 7 November 2017 Permanency Planning Order regarding minor children I.K. ("Iliana") and K.M.

("Kevin"),[1] which ceased reunification efforts between the children and respondents—respondent-mother ("Patty") and respondent-father ("Isaac") (together "respondents")—and awarded guardianship of both children to their maternal grandmother; a 7 August 2018 opinion from this Court vacating the 7 November 2017 Permanency Planning Order and remanding for further findings to address Respondents' fitness, whether they acted inconsistently with their constitutionally protected status, and why reunification efforts should cease as to Iliana and Kevin; and a 22 March 2019 Permanency Planning Order ("the Order"). Respondents timely appeal the Order as to Iliana.

The background of this case is partially incorporated from the text of our 7 August 2018 opinion, which vacated the 7 November 2017 Permanency Planning Order.

> Iliana was born to Respondents in December 2012. On 10 November 2014, the Rockingham County Department of Social Services received a report that Respondents lived in a "hoarder home" that was unsafe, Respondents sold their food stamps, Kevin was small for his age, there was fighting in the home, and Respondents were smoking marijuana and snorting Percocet. The Rockingham County Department of Social Services investigated this report, but no services were recommended at the time.
>
> In 2015, the Orange County Department of Social Services ("DSS") received two reports alleging that Patty had snorted pills while Kevin was in the home, and that Patty and her brother were involved in a domestic dispute that

---

[1] Pseudonyms are used throughout this opinion to protect the identity of juveniles and for the ease of reading.

resulted in the brother shaking and hitting Kevin. At that point, Respondents were provided in-home services to address concerns of substance use, mental health, and domestic violence. On 8 January 2016, Patty was sentenced to 45 days in jail for shoplifting and violating her probation. Patty received another 45 day[s in jail] in April 2016 after [she tested positive for cocaine during her probation]. At that time, Respondents placed Iliana with the maternal grandmother[,] . . . [with whom] Kevin had been residing [for the previous five years]. On 5 August 2016, Patty informed a DSS employee that [she and Isaac] were being evicted from their home and were homeless.

Due to concerns regarding Respondents' unstable housing, substance abuse, and lack of engagement in substance abuse treatment services, DSS filed juvenile petitions on 10 August 2016 alleging that Kevin and Iliana were neglected and dependent juveniles. DSS obtained nonsecure custody that same day. Following a 15 September 2016 hearing, the trial court entered an order on 13 October 2016 adjudicating the juveniles dependent, keeping temporary legal and physical custody with the maternal grandmother. The order required Respondents to submit to random drug screens, seek substance abuse treatment services, and follow any treatment recommendations. After a permanency planning hearing on 2 March 2017, the trial court entered an order on 27 March 2017 establishing a primary permanent plan of guardianship with the maternal grandmother and a secondary plan of reunification with Respondents. Following a 5 October 2017 permanency planning hearing, the trial court entered a 7 November 2017 order ceasing reunification efforts and awarding guardianship of the children to the maternal grandmother. Respondents timely appealed the 7 November 2017 order.

*In re I.K., K.M.*, 260 N.C. App. 547, 548-49, 818 S.E.2d 359, 361 (2018). Our

7 August 2018 opinion vacated and remanded the trial court's 7 November 2017

Order for the reasons stated therein and required the trial court to "make the required finding that Respondents were unfit or had acted inconsistently with their constitutionally protected status as parents . . . in [order to apply] the best interest of the child test to determine that guardianship with the maternal grandmother was in the children's best interests." *Id.* at 555, 818 S.E.2d at 365.

On 2 November 2018, the trial court again awarded guardianship of Kevin to the maternal grandmother, and respondents did not appeal. That same day, the trial court continued the permanency planning hearing as to Iliana. The trial court conducted a permanency planning hearing on 3 January 2019 and 18 January 2019, in which it heard further testimony from DSS employees, the maternal grandmother, and respondents. On 22 March 2019, the trial court entered the present order finding respondents had acted inconsistently with their constitutionally protected right to parent Iliana, and again awarding guardianship of Iliana to her maternal grandmother.

## II.  Discussion

Respondents argue that the trial court erred in the Order by:  (a) finding that respondents acted inconsistently with their constitutionally protected right to parent Iliana, where such a finding was not supported by clear and convincing evidence; (b) making various findings and conclusions of law required by statute that were not supported by competent evidence; (c) making erroneous findings and conclusions of

law that did not support its award of guardianship to Iliana's maternal grandmother under N.C. Gen. Stat. §§ 7B-906.1, -906.2 (2019); and (d) failing to provide respondents with notice of their right to file a motion to review the visitation plan with the trial court pursuant to N.C. Gen. Stat. § 7B-905.1(d) (2019). For the following reasons, we find no merit to respondents' arguments and affirm the Order.

A. Conduct Inconsistent with Constitutionally Protected Parental Status

Respondents argue that clear and convincing evidence did not support the trial court's relevant findings and conclusion of law that they had acted inconsistently with their constitutionally protected right to parent Iliana, and the trial court accordingly erred by proceeding to place Iliana's best interest at the forefront of its decision. We disagree.

Respondents correctly note that a higher evidentiary standard applies to the present circumstances where the trial court has ordered custody with someone other than a child's natural parent as the permanent plan and concluded concurrent planning involving reunification with the child's parents. *In re B.G.*, 197 N.C. App. 570, 574-75, 677 S.E.2d 549, 552-53 (2009).

> A natural parent's constitutionally protected paramount interest in the companionship, custody, care, and control of his or her child is a counterpart of the parental responsibilities the parent has assumed and is based on a presumption that he or she will act in the best interest of the child. Therefore, the parent may no longer enjoy a paramount status if his or her conduct is inconsistent with this presumption or if he or she fails to shoulder the

responsibilities that are attendant to rearing a child. If a natural parent's conduct has not been inconsistent with his or her constitutionally protected status, application of the "best interest of the child" standard in a custody dispute with a nonparent would offend the Due Process Clause. However, conduct inconsistent with the parent's protected status, which need not rise to the statutory level warranting termination of parental rights, would result in application of the "best interest of the child" test without offending the Due Process Clause. Unfitness, neglect, and abandonment clearly constitute conduct inconsistent with the protected status parents may enjoy. Other types of conduct, which must be viewed on a case-by-case basis, can also rise to this level so as to be inconsistent with the protected status of natural parents. Where such conduct is properly found by the trier of fact, based on evidence in the record, custody should be determined by the "best interest of the child" test mandated by statute.

*Price v. Howard*, 346 N.C. 68, 79, 484 S.E.2d 528, 534-35 (1997) (internal citations omitted).

"There is no bright line beyond which a parent's conduct amounts to action inconsistent with the parent's constitutionally protected paramount status. Our Supreme Court has emphasized the fact-sensitive nature of the inquiry, as well as the need to examine each parent's circumstances on a case-by-case basis. The court must consider both the legal parent's conduct and his or her intentions *vis-à-vis* the child." *In re A.C.*, 247 N.C. App. 528, 536, 786 S.E.2d 728, 735 (2016) (alterations, internal quotations marks and citations omitted).

Analyzing the totality of the circumstances noted in the Order's findings of fact, for the following reasons we hold that the trial court did not err in determining

that respondents acted inconsistently with their constitutionally protected status as Iliana's parents.

## 1.     Findings of Fact

In our review of a trial court's findings relevant to its determination that a parent has acted inconsistently with his constitutionally protected status, "[t]he Due Process Clause . . . requires that [such findings] must be supported by clear and convincing evidence." *Id.* at 533, 786 S.E.2d at 733 (footnote and citation omitted). "The clear and convincing standard requires evidence that should fully convince. This burden is more exacting than the preponderance of the evidence standard generally applied in civil cases, but less than the beyond a reasonable doubt standard applied in criminal matters. Our inquiry as a reviewing court is whether the evidence presented is such that a fact-finder applying that evidentiary standard could reasonably find the fact in question." *Id.* at 533, 786 S.E.2d at 734 (alterations, internal quotation marks, and citations omitted).

In their separate briefs, respondents argue that numerous findings of fact in the Order are not supported by clear and convincing evidence. These findings relate to the court's belief that respondents' historic issues with unsuitable housing, domestic violence, and substance abuse which caused Iliana to be placed with her maternal grandmother still persisted and impeded Iliana's ability to safely return to their parental care.

For example, the trial court found that "[b]oth [respondents] have acted inconsistently with their constitutionally-protected right to parent the minor child." In support of this finding, the trial court made specific findings regarding the respondents' voluntary placement of Iliana with her maternal grandmother due to "[Patty]'s impending incarceration and [Isaac]'s lack of suitable housing and work schedule," the remaining absence of "safe and stable housing appropriate for [Iliana] in the three (3) years the juvenile has been out of their custody," and the respondents' continued acts of domestic violence and illegal drug use. Our analysis focuses on whether clear and convincing evidence was presented to the trial court on the issues of housing, domestic violence, and drug use.

a. <u>Housing</u>

Respondents challenge the trial court's findings to the effect that respondents failed to rectify their housing situation to an extent that Iliana could return to live with them. In particular, the trial court found the following: "the home in which [respondents] were living . . . was deemed not suitable for [Iliana] when RCDSS visited the home in the spring of 2018 and again on 12/12/2018"; "the issues of . . . safe . . . housing are still present"; "[respondents] continue to reside with their infant daughter and [Iliana's] paternal grandmother . . . in a two-bedroom single wide trailer that has holes in the floor that were recently covered with plywood . . . and that has not otherwise been maintained"; "the housing conditions of [respondents] . . .

was not safe and appropriate for [Iliana]. Any improvements made between the beginning of th[e] hearing and its conclusion are not indicative of the day-to-day condition of the home"; "[respondents] continue to reside . . . [in a] home [that] is not appropriate at this time for placement of [Iliana]"; and "[respondents] are not making adequate progress [and] . . . have not resolved the issues of . . . instable housing that led to removal of custody."

Ample evidence supported the trial court's findings that the cluttered, crowded, dilapidated single-wide trailer in which respondents resided with their newborn and Isaac's mother was an unsafe and unsuitable place for Iliana to dwell. Jordan Houchins ("Mr. Houchins"), an investigator with Rockingham County Child Protective Services, testified that in the spring of 2018 he visited the trailer and observed clutter "piled up literally to the ceiling", and opined "that [he] would consider [this] a hoarding situation[.]" Mr. Houchins also observed structural issues with the floors of the small trailer. When Mr. Houchins visited the trailer again in December 2018, the same issues remained. Isaac's mother told Mr. Houchins a child could sleep on the pull-out couch in the living room if Iliana lived in the trailer, as a child already lived in the trailer with respondents and Isaac's mother. Mr. Houchins testified, consistent with the Adjudication Court Report, that he had concern about young children living in a small trailer in that condition. Mr. Houchins noted that a child currently resided at the trailer, but expressed concern with another child

coming to live at the trailer, in light of the trailer's size, clutter, condition of the floors, and Isaac's mother's health and mobility difficulties.

Citing only photographs taken during the proceedings on 3 January 2019 showing a slight improvement in the clutter and reinforced plywood flooring, respondents would have us contravene the trial court's finding that "the day-to-day condition of the home" was presently unsafe. Such a contravention would be an improper usurpation of the trial court's credibility judgment between conflicting evidence. These pictures alone, taken after initiation of the instant proceedings once it became apparent that unsafe housing was an area of concern for the trial court, are insufficient to override the court's credibility assessment of the evidence before it concerning the safety and suitability of respondents' current housing situation. The trial court expressly found the reports and testimony presented by the guardian *ad litem* and social workers assigned to the case more credible than respondents' representations as to recent improvements in the condition of the trailer.

"In a nonjury trial, it is the duty of the trial judge to consider and weigh all of the competent evidence, and to determine the credibility of the witnesses and the weight to be given their testimony. If different inferences may be drawn from the evidence, the trial judge must determine which inferences shall be drawn and which shall be rejected." *In re Gleisner*, 141 N.C. App. 475, 480, 539 S.E.2d 362, 365-66 (2000) (internal citations omitted). A trial court's credibility assessments are no basis

for relief on appeal in child protection proceedings or otherwise. *See In re A.C.*, 247 N.C. App. at 550 n.8, 786 S.E.2d at 743 n.8 (citation omitted). Here, the trial court acted within its discretion in finding the testimony and reports of the guardian *ad litem* and social workers who had visited the home more credible on the issue of the trailer's current condition than a few photographs taken during the proceedings.

While we may presume that respondents will not remove the reinforced plywood flooring at the termination of these proceedings, the trial court possessed clear and convincing evidence that the remaining issues identified with the trailer related to clutter, living space, and other structural issues remained impediments to Iliana's safe placement within the dwelling. When coupled with the trial court's uncontested finding that "[r]espondent parents indicate they plan to reside with [the paternal grandmother] in the future despite the ongoing concerns about the safety and appropriateness of the condition of the home[,]" the trial court appropriately found that respondents' failure to furnish safe and suitable housing for Iliana bore upon whether their conduct was inconsistent with their constitutionally protected parental rights.

b.    Domestic Violence

Respondents also challenge the Order's findings to the effect that respondents have failed to rectify their issues with domestic violence to an extent that Iliana could return to live with them. In particular, the trial court found the following:

"[respondents] continue to engage in domestic violence . . . despite their completion of treatment and classes"; "the issues of . . . domestic violence . . . are still present despite numerous services that have been offered to the family"; "[t]here has not been another identified domestic violence incident between Respondent parents, however there has been domestic violence in the home between [Isaac] and his mother"; "[t]he issues that led to removal of custody, to wit, . . . domestic violence, . . . have not been resolved."

These findings of fact are erroneous as to Patty. The trial court considered evidence that she regularly participated in counseling regarding domestic violence and had not been involved in a domestic violence incident with Isaac since October of 2016. There was no other evidence indicating Patty's past issues with domestic violence persisted.

However, these findings of fact are supported by clear and convincing evidence as to Isaac. The trial court's remaining unchallenged findings of fact establishing respondents' extensive history of domestic violence issues, when coupled with evidence of the most recent domestic disturbance Isaac had with his mother in the same trailer in which he wishes Iliana to reside, support its ultimate finding that he has not resolved his issues with domestic violence to an extent necessary to safely place Iliana in his custody.

Emily Wise ("Ms. Wise"), the DSS "assigned social worker for [Iliana]," testified concerning the respondents' extensive history of domestic violence, which she also detailed in the Adjudication Court Report. In particular, Isaac was convicted of misdemeanor assault on a female as a result of an incident between Patty and him in October 2016.

The Order mischaracterizes the most recent domestic incident as one involving actual physical violence. In fact, the evidence shows that police were called to the residence on 23 August 2018 to respond to reports of a loud verbal disagreement. However, the OCDSS report characterizes the incident as more than just a simple argument. Rather, Isaac was reportedly being "verbally aggressive . . . and was 'tearing up' the [trailer]." This evidence certainly does not refute the court's continuing concern.

While a trial court may not solely "rely on prior events to find [facts relevant to the current state of matters in issue at a permanency planning hearing], it may certainly consider facts at issue in light of prior events." *In re A.C.*, 247 N.C. App. at 535, 786 S.E.2d at 735 (citing *Cantrell v. Wishon*, 141 N.C. App. 340, 344, 540 S.E.2d 804, 806-807 (2000) ("[T]he trial court erroneously placed *no* emphasis on the mother's past behavior, however inconsistent with her rights and responsibilities as a parent[;] . . . failed to consider the long-term relationship between the mother and her children; . . . and failed to make findings on the mother's role in building the

relationship between her children and the [nonparent custodians].")). In light of the trial court's detailed, unchallenged findings establishing Isaac's extensive history of domestic violence and reluctance to complete perpetrator programs except as mandated by the court, the trial court acted within its discretion in characterizing his most recent outburst as an indication that his issues with domestic violence have not been resolved to the extent necessary to place Iliana in his care.

c.   Substance Abuse

Finally, respondents challenge the trial court's findings to the effect that respondents have failed to rectify their issues with substance abuse to an extent that Iliana could return to live with them. In particular, the trial court found the following: "[respondents] continue to engage in . . . illegal drug use despite their completion of treatment and classes"; "the issues of substance use . . . and safe, substance-free housing are still present despite numerous services that have been offered to the family"; "[respondents] continue to use marijuana despite substance abuse treatment. [Patty] has sought prescription painkillers from her mother on more than one occasion while [Iliana] has been placed out of the home"; and "[respondents] are not making adequate progress . . . [and] have not resolved the issue[] of substance abuse . . . that led to removal of custody."

Clear and convincing evidence supported these findings of fact as to both respondents. The trial court considered evidence that respondents completed

substance abuse treatment on 16 March 2018. Respondents provided hair follicles for a drug screen, and the screen of both respondents on 4 September 2018 indicated marijuana use. The trial court was also presented with evidence of Patty's continued drug seeking behavior after the 7 November 2017 Permanency Planning Order.

Ms. Wise testified that Patty had engaged in drug seeking behavior after the appeal and remand of the 7 November 2017 Order. Specifically, Patty texted "her mother . . . requesting pain medications on several occasions," including a text message asking "Do you have a couple of pills I can get?" on 10 June 2018, as well as a text message on 10 August 2018 requesting pain medication. Patty's drug seeking behavior is supportive of the trial court's findings of Patty's continued drug use.

The trial court heard evidence that Isaac completed his substance abuse treatment program in March of 2018 and has since tested positive for marijuana on the same day as Patty and exchanged text messages with her seeking to purchase marijuana. Therefore the court had clear and convincing evidence before it that, viewed in light of Isaac's extensive history of substance abuse recognized by the majority, there was legitimate cause to question whether he had overcome this problem such that Iliana could be safely placed within his home. The trial court also found that he intended to continue residing indefinitely with Patty, who continues to exhibit drug-seeking behavior, in the very trailer where they were previously known to snort pills and consume other impairing substances together in front of their

children. We therefore uphold the trial court's findings of fact to the effect that respondents have not overcome their substance abuse issues to its satisfaction in deciding whether placement of Iliana in their home would be appropriate.

## 2. Conclusion of Law

The order's aforementioned findings of fact support the trial court's conclusion of law that respondents' conduct was inconsistent with their constitutionally protected right to parent Iliana. Clear and convincing evidence supported the Order's findings that recent incidents raised serious concerns about their progress in resolving their chronic issues related to unsafe housing, domestic violence, and substance abuse that had precipitated the circumstances in which Iliana was adjudicated dependent and placed with her maternal grandmother in 2014. When considered in light of the order's undisputed findings establishing respondents' extensive history as to each of these chronic issues and their detrimental effect on Iliana, we uphold the trial court's determination that the totality of circumstances relevant to their conduct was inconsistent with their constitutionally protected status as Iliana's parents. Having overcome this constitutional threshold, the trial court appropriately placed Iliana's best interest at the forefront of its decision to grant guardianship to her grandmother as the permanent plan.

## B. Analysis Under the Statutory Standard for Permanency Planning

Respondents make the same evidentiary challenges to the trial court's findings of fact in arguing that they fail to satisfy the statutory requirements applicable to an order granting guardianship to a nonparent as the permanent plan over a parent's objections. In essence, they contend that competent evidence does not support the trial court's findings that they have failed to resolve the issues of domestic violence, substance abuse, and instable housing that lead to Iliana's placement with her grandmother three years prior. Having already determined that these findings of fact clear the higher constitutional bar imposed by the Due Process Clause, we hold that the trial court heard competent evidence to support these findings.

In turn, these findings support the statutorily required ultimate findings of fact and the order's conclusions of law with which respondents take issue. "In choosing an appropriate permanent plan under N.C. Gen. Stat. § 7B-906.1 (2013), the juvenile's best interests are paramount. We review a trial court's determination as to the best interest of the child for an abuse of discretion." *In re A.C.*, 247 N.C. App. at 532-33, 786 S.E.2d at 733 (citation omitted). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re T.H.*, __ N.C. App. __, __, 832 S.E.2d 162, 164 (2019) (quoting *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988)).

Pursuant to N.C. Gen. Stat. § 7B-906.1(d), the trial court held that efforts to reunite Iliana with her parents would be unsuccessful or inconsistent with her health, safety, and need for a safe and permanent home within a reasonable period of time.[2] This conclusion rested upon its determination that "[t]he issues that lead to removal of custody . . . have not been resolved." Per N.C. Gen. Stat. § 7B-906.1(e), the trial court also held that it was not possible to place Iliana with her parents within the next six months and doing so was not in her best interest. This conclusion was based upon its continuing concerns with the issues leading to State involvement and respondents' plan to continue residing in the trailer deemed inappropriate for Iliana's placement. For the same reasons, the trial court held that respondents demonstrated a lack of success by not making adequate progress under the secondary plan of reunification and acting in a manner inconsistent with the health or safety of Iliana, pursuant to N.C. Gen. Stat. § 7B-906.2(d).

The trial court's ultimate findings on each of these matters find ample support in its findings of fact discussed *supra* regarding the trial court's continuing concerns with respondents' domestic violence, substance abuse, and inadequate housing. These ultimate findings in turn support its conclusion that "[t]he best plan of care to achieve a safe, permanent home for [Iliana] within a reasonable period of time is implementation of the primary plan of guardianship to . . . [her] maternal

---

[2] The trial court made findings of fact speaking to all the requisite criteria in N.C. Gen. Stat. §§ 7B-906.1, -906.2. We address only those challenged by respondents.

grandmother[,]" and that such placement would be in her best interest. The court's decision is not manifestly unsupported by reason. Therefore, the trial court did not abuse its discretion in its permanency planning order granting guardianship of Iliana to her grandmother.

## C.    Visitation Plan

Respondents respectively challenge the visitation plan within the Order on separate grounds. We find no merit in either argument.

### 1.    Parameters of Visitation Plan

Patty challenges the trial court's visitation order, which limited her to "a minimum of one hour per week of supervised visitation [with Iliana]." "This Court reviews the trial court's dispositional orders of visitation for an abuse of discretion." *In re C.S.L.B.*, 254 N.C. App. 395, 399, 829 S.E.2d 492, 495 (2017) (internal quotation marks and citation omitted). Patty's arguments center on whether visitation should be unsupervised, and she contends the trial court lacked competent evidence to order visitation supervised by Iliana's maternal grandmother.

According to N.C. Gen. Stat. § 7B-905.1(c) (2019),

> If the juvenile is placed or continued in the custody or guardianship of a relative or other suitable person, any order providing for visitation shall specify the minimum frequency and length of the visits and whether the visits shall be supervised. The court may authorize additional visitation as agreed upon by the respondent and custodian or guardian.

The trial court ordered that "Respondent[s] shall have a minimum of one hour per week of supervised visitation. The guardian has the authority and discretion to allow additional visitation." The trial court's order complied with N.C. Gen. Stat. § 7B-905(c). The trial court also heard testimony that respondents' unsupervised visitation had previously been rescinded due to separate instances of visitation where respondents "appeared to be under the influence." Iliana's guardian *ad litem* recommended supervised visitation. Iliana's therapist's letter also described concerns with changing the juvenile's routine, and that current treatment involved "the use of structure and predictability" to increase Iliana's ability to "accept care and feel settled and soothed by an adult caregiver as well as increasing [Iliana's] trust in adults to take care of her needs." The trial court's order for supervised visitation as to Patty is not manifestly unsupported by reason, and the trial court did not abuse its discretion.

## 2. Notice of Right to File Motion to Review Visitation Plan

Finally, Isaac argues that the trial court failed to provide him with notice of his right to file a motion with the court to review the visitation plan established in the Order, as required by N.C. Gen. Stat. § 7B-905.1(d). We find no merit in this argument and otherwise deem any purported error harmless.

"If the court retains jurisdiction" in its dispositional order in a permanency planning case, "all parties shall be informed of the right to file a motion for review of

- 20 -

any visitation plan entered pursuant to this section." N.C. Gen. Stat. § 7B-905.1(d). Here, in open court the trial court made the parties aware in a general sense that it would retain continuing jurisdiction and could review any aspect of its permanency planning order upon its own motion or that of a party: "[B]ecause [Iliana] has been placed with her grandmother . . . if something changes at some point, the motions can be made back to this Court if changes need to be made." Furthermore, in its written order the court noted that "[a]ll parties are aware that the matter may be brought before the Court for review at any time by the filing of a motion for review or on the Court's own motion" and "Juvenile Court jurisdiction shall continue."

Assuming *arguendo* Isaac's position that the trial court was required to explicitly reference the parties' right of review under N.C. Gen. Stat. § 7B-905.1(d), any such error was harmless. Isaac has not pointed to any right lost or prejudiced by the trial court's failure to timely provide such notice. Moreover, Isaac's mere assignment of error on this issue indicates that he has since become aware of his right of review under N.C. Gen. Stat. § 7B-905.1(d). We otherwise find no merit in his argument that any purported inadequacy of the notice provided amounts to reversible error.

## III.    Conclusion

For the foregoing reasons, we affirm the trial court's permanency planning order.

AFFIRMED.

Judge INMAN concurs.

Judge Murphy concurs in part and dissents in part in separate opinion.

MURPHY, Judge, concurring in part and dissenting in part.

The Majority determined that clear and convincing evidence supported the findings relevant to the trial court's determination that Patty and Isaac acted inconsistently with their constitutionally protected right to parent Iliana. Specifically, the Majority held that clear and convincing evidence supported the trial court's findings that Patty and Isaac had failed to resolve issues with housing, domestic violence, and drug abuse to an extent they could reunite with Iliana. I agree that competent evidence supported the trial court's finding that Patty had not resolved *one* of those issues—drug abuse—and so would affirm the Order's finding and conclusion concerning Patty acting inconsistently with her constitutionally protected right to parent Iliana. I also agree with the Majority that "the trial court's order for supervised visitation as to Patty is not manifestly unsupported by reason, and the trial court did not abuse its discretion." However, no competent evidence was presented to the trial court as to Isaac on the issues of housing, domestic violence, and drug abuse, and I would accordingly reverse as to Isaac. I respectfully dissent.

## ANALYSIS

**A. Challenged Findings in the 22 March 2019 Permanency Planning Order**

In their separate briefs, Patty and Isaac challenged the following Findings of Fact in the Order:

> 26. Both [Patty] and [Isaac] have acted inconsistently with their constitutionally-protected right to parent [Iliana]. Specifically, this court finds as follows:

a. [Patty and Isaac] voluntarily placed [Iliana] with her maternal grandmother on [26] April [] 2016 because of [Patty]'s impending incarceration and [Isaac]'s lack of suitable housing and work schedule.

b. [Patty and Isaac] have not obtained safe and stable housing appropriate for [Iliana] in the three (3) years [Iliana] has been out of their custody. Though the home in which they were living was found to have met minimum standards by RCDSS on two visits between [2] March [] 2017 and [5] October [] 2017, the home was deemed not suitable for [Iliana] when RCDSS visited the home in the spring of 2018 and again on [12 December 2018].

c. [Patty and Isaac] continue to engage in domestic violence and illegal drug use despite their completion of treatment and classes.

27. When this hearing began on [3] January [] 2019, [Patty and Isaac] were still residing with [Isaac]'s mother in a home that Rockingham County DSS deemed unsuitable for the children as late as [12] December [] 2018.

28. [Patty and Isaac] have made some limited progress to remedy conditions that led to [Iliana] being removed from their home. However, the issues of substance use, domestic violence, and safe, substance-free housing are still present despite numerous services that have been offered to the family since the issues were first identified in 2014.

. . .

30. [Patty] concluded a domestic violence support group at the Compass Center in May 2017. [Isaac] completed a domestic violence perpetrator program at Alamance County DV Prevention in February 2018. There has not been another identified domestic violence incident between [Patty and Isaac], however there has been domestic violence in the home between [Isaac] and his mother[.]

. . .

34. Despite [Isaac] earning a gross income of $46,349.00 per year in a job he has maintained for 10 years and [Isaac's mother] paying a portion of the household expenses, [Patty and Isaac] continue to reside with their infant daughter and [Isaac's mother] with whom they moved after eviction in 2016 in a two-bedroom single wide trailer that has holes in the floor that were recently covered with plywood at the request of RCDSS, and that has not otherwise been maintained.

. . .

37. At the continuation of this hearing on [18] January [] 2019, [Patty and Isaac] provided photographs of the home that showed somewhat improved conditions from the conditions reflected in the photographs and testimony presented on [3] January [] 2019. [Patty] testified that the new photos were taken after the [3] January [] 2019 beginning of the hearing. The court finds the testimony and documentation of Rockingham County DSS to be credible, and that the housing conditions of [Patty and Isaac] as of [12] December [] 2018 was not safe and appropriate for the minor child. Any improvements made between the beginning of this hearing and its conclusion are not indicative of the day-to-day condition of the home.

. . .

40. The following are relevant pursuant to N.C.G.S. § 7B-906.1(d): . . .
    c. Efforts to reunite [Iliana] with either [Patty or Isaac] would be unsuccessful or inconsistent with [Iliana's] health or safety and need for a safe, permanent home within a reasonable period of time. The issues that led to removal of custody, to wit, substance abuse, domestic violence, and housing, have not been resolved. [Iliana] has resided with her maternal grandmother for over half of her life.

3

41.  The Court finds, pursuant to N.C.G.S. § 7B-906.1(e), it is not possible for [Iliana] to be returned home or placed with Respondent[s] within the next six months.  Placement with Respondent[s] is not in [Iliana's] best interest. In support of this ultimate finding of fact, the court specifically finds the following[3]:

. . .

    b.    [Patty and Isaac] have been involved with the Department since October 2015 due to concerns about substance use, domestic violence, and unstable housing, and had involvement with Rockingham County DSS in 2014 regarding the same issues that remain unresolved in 2019.

    c.    [Patty and Isaac] continue to use marijuana despite substance abuse treatment.  [Patty] has sought prescription painkillers from her mother on more than one occasion while [Iliana] has been placed out of the home.

    d.    [Patty and Isaac] continue to reside with [Isaac's mother].  This home is not appropriate at this time for placement of [Iliana].

b.    Placement with [Patty] or [Isaac] is unlikely within six months, and:

    i.    Legal guardianship or custody with a relative should be established.  [Patty and Isaac] should retain the right of visitation and the responsibility of providing financial support to [Iliana] by paying regular child support.

    ii.    Adoption should not be pursued.

    iii.    [Iliana] should remain in the current

---

[3] The tabbing and inclusion of the first "b.," "c.," and "d." before the second "b.", etc., appears in the Order in the Record.

placement because it is meeting her needs and in her best interests.

    iv. Due to the history of the case and relationship between [respondents] and [the maternal grandmother], the guardian ad litem recommends guardianship to [the maternal grandmother] in [Iliana's] best interest.

c. Since the initial permanency planning hearing, OCDSS has made reasonable efforts to finalize [Iliana's] permanent plans as laid out below.

. . .

43. Pursuant to N.C.G.S. § 7B-906.2(d), the following demonstrate a lack of success:

    a. [Patty and Isaac] are not making adequate progress within a reasonable period of time under the secondary plan of reunification. They have not resolved the issues of substance abuse and instable housing that led to removal of custody.

    b. [Patty and Isaac] have partially participated in or cooperated with the plan, the department, and [Iliana's] Guardian ad Litem.

. . .

    d. [Patty and Isaac] have acted in a manner inconsistent with the health or safety of [Iliana] as set forth herein.

44. The best plan of care to achieve a safe, permanent home for [Iliana] within a reasonable period of time is implementation of the primary plan of guardianship to a relative, specifically to [the maternal grandmother].

. . .

57. The Court finds pursuant to N.C.G.S. § 7B-906.1(n):

    . . .

5

    b.    The placement is stable, and continuation of
          the placement is in her best interest.

In their separate briefs, Patty and Isaac challenged the following Conclusions

of Law in the Order:

    2.    It is in the best interest of [Iliana] that guardianship
          be granted to [the maternal grandmother].
    . . .

    4.    Implementation of guardianship as a permanent
          plan for [Iliana] is made within the time prescribed
          by law, is appropriate and is in [Iliana's] best
          interest.
    . . .

    6.    [Patty and Isaac] have acted inconsistently with
          their protected status.

    7.    [The maternal grandmother] is a fit and proper
          person to have guardianship of [Iliana] and that it is
          in the best interest of [Iliana] that guardianship be
          granted to and continued with [Iliana's maternal
          grandmother].

    8.    It is in the best interest of [Iliana] to have supervised
          visitation with [Patty and Isaac] once per week
          pursuant to the schedule that [Patty and Isaac] and
          caretaker have been following for the last several
          months.

## B. Standard of Review

"Appellate review of a permanency planning order is limited to whether there

is competent evidence in the [R]ecord to support the findings and [whether] the

findings support the conclusions of law." *In re S.J.M.*, 184 N.C. App. 42, 47, 645

S.E.2d 798, 801 (2007), *aff'd*, 362 N.C. 230, 657 S.E.2d 354 (2008).  Further, "[t]he

6

findings of fact by the trial court in a nonjury trial have the force and effect of a jury verdict and are conclusive on appeal when supported by any competent evidence, even if the evidence could sustain contrary findings." *In re Norris*, 65 N.C. App. 269, 275, 310 S.E.2d 25, 29 (1983). "When the trial court is the trier of fact, the court is empowered to assign weight to the evidence presented at the trial as it deems appropriate. In this situation, the trial judge acts as both judge and jury, thus resolving any conflicts in the evidence." *In re Oghenekevebe*, 123 N.C. App. 434, 439, 473 S.E.2d 393, 397 (1996) (internal citations omitted).

"[T]he . . . right of parents to make decisions concerning the care, custody, and control of their children[]" is fundamental. *Troxel v. Granville*, 530 U.S. 57, 66, 147 L.Ed.2d 49, 57 (2000). "A natural parent's constitutionally protected paramount interest in the companionship, custody, care, and control of his or her child is a counterpart of the parental responsibilities the parent has assumed and is based on a presumption that he or she will act in the best interest of the child." *Price v. Howard*, 346 N.C. 68, 79, 484 S.E.2d 528, 534 (1997) (citations omitted). "[A] natural parent may lose his constitutionally protected right to the control of his children in one of two ways: (1) by a finding of unfitness of the natural parent, or (2) where the natural parent's conduct is inconsistent with his . . . constitutionally protected status." *In re D.M.*, 211 N.C. App. 382, 385, 712 S.E.2d 355, 357 (2011) (quoting *David N. v. Jason N.*, 359 N.C. 303, 307, 608 S.E.2d 751, 753 (2005)).

We review "the trial court's conclusions that [a parent] has acted in a manner inconsistent with her constitutionally protected paramount status . . . *de novo*." *In re A.C.*, 247 N.C. App. 528, 535, 786 S.E.2d 728, 735 (2016) (internal marks omitted). "[A] trial court's determination that a parent's conduct is inconsistent with his or her constitutionally protected status must be supported by clear and convincing evidence." *Adams v. Tessener*, 354 N.C. 57, 63, 550 S.E.2d 499, 503 (2001). "There is no bright line beyond which a parent's conduct amounts to action inconsistent with the parent's constitutionally protected paramount status. Our Supreme Court has emphasized the fact-sensitive nature of the inquiry, as well as the need to examine each parent's circumstances on a case-by-case basis." *In re A.C.*, 247 N.C. App. at 536, 786 S.E.2d at 735 (internal marks and citations omitted).

"[T]o apply the best interest of the child test in a custody dispute between a parent and a nonparent, a trial court must find that the natural parent is unfit or that his or her conduct is inconsistent with a parent's constitutionally protected status." *In re B.G.*, 197 N.C. App. 570, 574, 677 S.E.2d 549, 552 (2009) (citations omitted). Upon a *proper* finding of unfitness or actions inconsistent with the parent's constitutionally protected status, the trial court determines the best interest of the child. *Petersen v. Rogers*, 337 N.C. 397, 403-04, 445 S.E.2d 901, 905 (1994). When determining the appropriate permanent plan according to N.C.G.S. § 7B-906.1, "the trial court should consider the parents' right to maintain their family unit, but if the interest of the parent conflicts with the welfare of the child, the latter should prevail.

8

Thus, in this context, the child's best interests are paramount, not the rights of the parent." *In re T.K.*, 171 N.C. App. 35, 39, 613, S.E.2d 739, 741, *aff'd per curiam*, 360 N.C. 163, 622 S.E.2d 494 (2005) (citations and quotations omitted). "The court's determination of the juvenile's best interest will not be disturbed absent a showing of an abuse of discretion." *In re T.H.*, 832 S.E.2d 162, 164 (N.C. Ct. App. 2019) (quoting *In re E.M.*, 202 N.C. App. 761, 764, 692 S.E.2d 629, 630 (2010)); *see also In re D.S.A.*, 181 N.C. App. 715, 720, 641 S.E.2d 18, 22 (2007). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re T.H.*, 832 S.E.2d at 164 (quoting *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988)).

## C. Findings of Inconsistent Action with Constitutionally Protected Status on Remand

We vacated the 7 November 2017 Permanency Planning Order because the trial court failed to make the required finding that respondents were unfit or had acted inconsistently with their constitutionally protected status as parents. *See In re I.K.*, 260 N.C. App. 547, 550, 818 S.E.2d 359, 362 (2018). We held that, absent such a finding, the trial court erred in reaching a best interest of the child analysis to determine that guardianship with the maternal grandmother was in the best interest of Iliana and Kevin. *Id.* Our opinion focused on the absence of a necessary *finding*, *Id.* at 550, 555, 818 S.E.2d at 362, 365, and accordingly the bulk of my analysis in this Dissent focuses on the trial court's findings, and whether they were supported by competent evidence. Patty and Isaac only appeal the Order as to Iliana, not as to

Kevin, and I examine the trial court's findings and conclusions of law as to Iliana only.

The Order made the findings required by our opinion remanding the 7 November 2017 Permanency Planning Order. In particular, the trial court included Finding of Fact 26 in the Order, finding that "[b]oth [Patty and Isaac] have acted inconsistently with their constitutionally-protected right to parent the minor child." In support of Finding of Fact 26, the trial court made specific findings regarding respondents' voluntary placement of Iliana with her maternal grandmother due to "[Patty]'s impending incarceration and [Isaac]'s lack of suitable housing and work schedule," the remaining absence of "safe and stable housing appropriate for [Iliana] in the three (3) years [Iliana] has been out of [respondents'] custody," and the respondents' continued acts of domestic violence and illegal drug use. My analysis focuses on whether competent evidence was presented to the trial court on the issues of housing, domestic violence, and drug use. The Order also concluded as a matter of law that "[respondents] have acted inconsistently with their protected status."

The Order classifies its findings to comply with the requirements stated in our 7 August 2018 Order remanding the 7 November 2017 Permanency Planning Order for further findings of unfitness or inconsistent action with respondents' constitutionally protected status as parents. However, I note that several findings categorized as findings of fact were, at least partially, conclusions of law. *See In re Helms*, 127 N.C. App. 505, 510, 491 S.E.2d 672, 675 (1997) (internal citations and

alterations omitted) (holding that "any determination requiring the exercise of judgment, or the application of legal principles is more properly classified a conclusion of law"); *see also Plott v. Plott*, 313 N.C. 63, 73-74, 326 S.E.2d 863, 869-70 (1985). The trial court's classification of its own determination as a finding or conclusion does not govern this court's analysis. *See State v. Icard*, 363 N.C. 303, 308, 677 S.E.2d 822, 826 (2009); *State v. Burns*, 287 N.C. 102, 110, 214 S.E.2d 56, 61-62 (1975).

Specifically, the trial court's Findings of Fact 40(c), 41(b), and 43 in the Order actually amount to conclusions of law, inasmuch as they declare the following: whether "[e]fforts to reunite [Iliana] with either [Patty or Isaac] would be unsuccessful or inconsistent with [Iliana's] health or safety and need for a safe, permanent home within a reasonable period of time" under N.C.G.S. § 7B-906.1(d); that "[p]lacement with [respondents] is unlikely within six months" under N.C.G.S. § 7B-906.1(e); and the inadequacy of respondents' progress, participation, and cooperation in the reunification plan, including actions regarding "the health or safety of [Iliana]," under N.C.G.S. § 7B-906.2(d).

While the trial court made findings on remand to comply with the requirements of our 7 August 2018 opinion, I treat the portions of Findings 40(c), 41(b), and 43 requiring exercise of judgment or application of legal principles as conclusions of law and apply the appropriate de novo standard of review. *See Icard*, 363 N.C. at 308, 677 S.E.2d at 826 ("While we give appropriate deference to the

portions of [the relevant findings] that are findings of fact, we review de novo the portions of those findings that are conclusions of law.").

The trial court made findings regarding respondents' issues with housing, domestic violence, and drug abuse, and used those findings to support its finding that they acted inconsistently with their constitutionally protected right to parent Iliana. The Majority addressed the issues of housing, domestic violence, and drug abuse in that order. Accordingly, I analyze each of those issues as they relate to respondents in the same order as the Majority.

## D. Challenged Findings of Fact

### 1. Housing

On appeal, respondents challenge the trial court's Findings of Fact 26(b), 27, 28, 34, 37, 40(c), 41(d), 43(a), and 44, which find that respondents failed to rectify their housing situation to an extent that Iliana could return to live with them. In particular, the trial court found the following: "the home in which [respondents] were living . . . was deemed not suitable for [Iliana]"; the home was "deemed unsuitable for the children"; "the issues of . . . safe . . . housing are still present"; "[respondents] continue to reside . . . in a two-bedroom single wide trailer that has holes in the floor that were recently covered with plywood . . . and that has not otherwise been maintained"; "the housing conditions of [respondents] . . . was not safe and appropriate for [Iliana]. Any improvements made between the beginning of this hearing and its conclusion are not indicative of the day-to-day condition of the

12

home[]"; "[t]he issues that led to removal of custody, to wit, . . . housing, have not been resolved[]"; "[respondents] continue to reside . . . [in a] home [that] is not appropriate at this time for placement of [Iliana]"; "[respondents] are not making adequate progress [and] . . . have not resolved the issues of . . . instable housing that led to removal of custody[]"; and "[t]he best plan of care to achieve a safe, permanent home for [Iliana] within a reasonable period of time is . . . to [place Iliana with] maternal grandmother."

Jordan Houchins ("Houchins"), an investigator with Rockingham County Child Protective Services, testified that, in the spring of 2018, he visited Isaac's mother's home, where respondents lived, and observed clutter "piled up literally to the ceiling." Houchins also observed structural issues with the floors of the small trailer. When Houchins visited the trailer again in December 2018, the same issues remained. Isaac's mother told Houchins a child could sleep on the pull-out couch in the living room if Iliana lived in the trailer, as a child already lived in the trailer with her, Patty, and Isaac. Houchins testified, consistent with the Adjudication Court Report, that he had concern about young children living in a small trailer in that condition. Houchins noted that a child currently resided at the trailer, but expressed concern with another child coming to live at the trailer, in light of the trailer's size, clutter, condition of the floors, and Isaac's mother's health and mobility difficulties.

However, competent evidence did not support the findings of fact concerning respondents' *current* housing situation. I disagree with the Majority's analysis of this

13

issue, particularly its view that we would usurp the trial court's role in making a credibility determination between conflicting evidence by contravening the finding of unsafe day-to-day housing conditions in light of the photographs provided by respondents showing their housing situation had clearly changed. The trial court did not merely consider evidence that, in October 2017, respondents' housing situation had somewhat stabilized, or that "Rockingham County DSS [] visited [Isaac's mother's] home . . . and determined that it [met] minimum standards." Importantly, respondents provided pictures of floor reinforcements to that home at the 18 January 2019 hearing. Specifically, pictures 2, 7, 8, 10, 11, and 12 show sheets of plywood on the floor and are evidence that respondents improved the floors of the residence to improve the flooring problems described by Houchins. Pictures 1-9 show two bedrooms, a dining room, and a kitchen; each space is small and cluttered, but space is visible on the floors, beds, dresser, counter tops, table, and stove. These pictures contradicted the trial court's finding concerning "the day-to-day condition of the home," particularly that respondents resided in "housing conditions . . . not safe and appropriate for [Iliana]," as well as the conclusions that the "extremely cluttered . . . ho[a]rding" observed in the spring of 2018 and on 12 December 2018 and lack of space in the trailer continued. The pictures respondents provided of floor reinforcements at the 18 January 2019 hearing contradicted the trial court's finding that "the day-to-day condition of the home" *continued* to be unsafe, as the pictures did not show the holes in the floor, the hoarding observed in the spring of 2018 and 12 December 2018,

14

or the continuation of a lack of space in the trailer. These pictures provided objective proof of a change in circumstance as to respondents' housing, making the trial court's finding of fact incorrect. Instead of a credibility determination weighing the believability of contradictory evidence, the trial court's finding regarding respondents' housing situation disregarded objective facts established by photographic evidence.

Competent evidence did not support the trial court's findings that respondents' housing situation continued to be unsafe and too small for Iliana, which the trial court used to support its finding that respondents acted inconsistently with their constitutionally protected status as parents. In light of that lack of competent evidence to support the trial court's findings regarding respondents' housing, I would set aside Findings of Fact 26(b), 27, 28, 34, 37, 40(c), 41(d), 43(a), and 44 to the extent they find respondents had failed to rectify their housing situation to an extent that Iliana could not return to live with them.

**2. Domestic Violence**

On appeal, respondents challenge the trial court's Findings of Fact 26(c), 28, 30, 40, 41(b), and 44, which find that respondents had failed to rectify their issues with domestic violence to an extent that Iliana could return to live with them. In particular, the trial court found the following: "[respondents] continue to engage in domestic violence . . . despite their completion of treatment and classes[]"; "the issues of . . . domestic violence . . . are still present [with respondents] despite numerous

services that have been offered to the family[]"; "[t]here has not been another identified domestic violence incident between [respondents], however there has been domestic violence in the home between [Isaac] and his mother"; "[t]he issues that led to removal of custody, to wit, . . . domestic violence, . . . have not been resolved[]"; "[respondents] have been involved with the Department since October 2015 due to concerns about . . . domestic violence, . . . and . . . the same issues . . . remain unresolved in 2019[]"; and "[t]he best plan of care to achieve a safe, permanent home for [Iliana] within a reasonable period of time is . . . to [place Iliana with] maternal grandmother."

Emily Wise ("Wise"), the DSS "assigned social worker for [Iliana,]" testified concerning respondents' history of domestic violence, which she also detailed in the Adjudication Court Report. In particular, Isaac was convicted of misdemeanor assault on a female as a result of an incident between Patty and him in October 2016. Wise also testified, to her knowledge, no additional domestic violence incidents had occurred between respondents since October 2016. She testified that police had been called to a domestic disturbance at Isaac's mother's house on 23 August 2018. Isaac testified that he was yelling at his mother during the incident, and Isaac's mother "reported it had been a family disagreement." "There were no criminal charges related to" the 23 August 2018 incident.

Competent evidence did not support the trial court's findings of fact concerning respondents' issues with domestic violence listed above. *No* known additional

domestic violence incidents have occurred between respondents since October 2016. While the trial court found that domestic violence has occurred between Isaac and his mother in the home respondents live in, the evidence in the Record does not support that violence actually occurred. In fact, the only evidence before the court described the incident as an argument, not as a violent or physical confrontation. I would not speculate about the hyperbolic statements in a 911 call log that Isaac was "'tearing up' the [trailer]" during this argument, particularly when no charges arose from the incident. Further, the trial court considered evidence that Patty regularly participated in counseling regarding domestic violence, and Isaac engaged in a perpetrator-related domestic violence program.

The evidence does not support the trial court's Findings of Fact that "[respondents] continue to engage in domestic violence," "the issues of . . . domestic violence . . . are still present [with respondents]," "there has been domestic violence in the home between [Isaac] and his mother" since 2017, or that respondents' issues with domestic violence remain unresolved. I agree with the Majority that the trial court's findings regarding Patty and domestic violence were erroneous, but disagree with its characterization of the evidence regarding Isaac and domestic violence. Competent evidence did not support the trial court's findings that respondents have not resolved their issues with domestic violence, which the trial court used to support Finding of Fact 26 that respondents acted inconsistently with their constitutionally protected status as parents. In light of that lack of competent evidence to support the

17

trial court's findings regarding respondents and domestic violence, I would set aside Findings of Fact 26(c), 28, 30, 40, 41(b), and 44 to the extent they find respondents had failed to rectify their issues with domestic violence to an extent that Iliana could not return to live with them.

**3. Drug Abuse**

On appeal, respondents challenge the trial court's Findings of Fact 26(c), 28, 40(c), 41(b), 41(c), 43(a), and 44, which find that Patty and Isaac had failed to rectify their issues with drug abuse to an extent that Iliana could return to live with them. In particular, the trial court found the following: "[Patty and Isaac] continue to engage in . . . illegal drug use despite their completion of treatment and classes[]"; "the issues of substance use . . . and safe, substance-free housing are still present despite numerous services that have been offered to the family"; "[t]he issues that led to removal of custody, to wit, substance abuse . . . have not been resolved[]"; "[Patty and Isaac] have been involved with the Department since October 2015 due to concerns about substance use, . . . and . . . the same issues [] remain unresolved in 2019[]"; "[Patty and Isaac] continue to use marijuana despite substance abuse treatment. [Patty] has sought prescription painkillers from her mother on more than one occasion while [Iliana] has been placed out of the home[]"; "[Patty and Isaac] are not making adequate progress . . . [and] have not resolved the issue[] of substance abuse . . . that led to removal of custody[]"; and "[t]he best plan of care to achieve a

safe, permanent home for [Iliana] within a reasonable period of time is . . . to [place Iliana with] maternal grandmother."

The trial court considered evidence that respondents completed substance abuse treatment on 16 March 2018. Wise testified that respondents provided hair follicles for a drug screen, and the screen of both respondents on 4 September 2018 indicated marijuana use. The trial court was also presented with evidence of Patty's continued drug seeking behavior after the 7 November 2017 Permanency Planning Order.

Wise testified that Patty had engaged in drug seeking behavior after the appeal and remand of the 7 November 2017 Order; specifically, Patty texted "her mother[] requesting pain medications on several occasions," including a text message asking "Do you have a couple of pills I can get?" on 10 June 2018, as well as a text message on 10 August 2018 requesting pain medication. Patty's drug seeking behavior is supportive of the trial court's findings of Patty's continued drug use. Since competent evidence supported the trial court's findings that Patty *continued* to abuse drugs, I agree with the Majority and would not set aside the challenged findings concerning Patty's issues with drug abuse.

However, the Record does not contain such evidence of continued drug seeking behavior as related to Isaac. Unlike evidence of Patty's continued drug seeking behavior after the appeal and remand of the 7 November 2017 Order, the only evidence since February 2017 of Isaac participating in drug use is a hair follicle

19

sample from 4 September 2018 indicating marijuana use. The Majority also mentions a text message exchange *between respondents* about marijuana on 4 April 2018, which did not constitute the same drug seeking behavior as Patty in her text messages to other individuals asking for drugs. The trial court was not presented with any other evidence showing Isaac's participation in drugs, or drug abuse, since February 2017, other than the 4 September 2018 test. Competent evidence did not support the trial court's findings that Isaac *continued* to abuse drugs, which the trial court used to support its finding that Isaac acted inconsistently with his constitutionally protected status as Iliana's parent. In light of that lack of competent evidence to support the trial court's findings regarding Isaac and continued drug abuse, I would set aside findings 26(c), 28, 40(c), 41(b), 41(c), 43(a), and 44 to the extent they find Isaac had failed to rectify his issues with drug abuse to an extent that Iliana could not return to live with him. Additionally, to the extent Finding of Fact 26 relied on findings that Isaac had failed to rectify his issues with housing, domestic violence, and drug abuse, I would set aside that Finding of Fact that Isaac had acted inconsistently with his constitutionally protected right to parent Iliana.

## E. Challenged Conclusion of Law 6

The trial court relied on the unsupported portions of Findings of Fact 26(b), 26(c), 27, 28, 30, 34, 37, 40, 41(b), 41(c), 41(d), 43(a), and 44 regarding respondents' housing, domestic violence, and drug abuse to support its Conclusion of Law 6 that respondents acted inconsistently with their constitutionally protected right to parent

Iliana. *See In re A.C.*, 247 N.C. App. at 535, 786 S.E.2d at 735. Specifically, I would review whether the remaining findings of fact support Conclusion of Law 6 in light of my previous analysis that competent evidence only supported the trial court's findings that *Patty* continued to abuse drugs. *See In re A.A.S.*, 258 N.C. App. 422, 429, 812 S.E.2d 875, 881 (2018); *see also In re A.B.*, 239 N.C. App. 157, 160, 768 S.E.2d 573, 575 (2015).

Clear and convincing evidence of Patty's continued drug seeking behavior supported the trial court's Conclusion of Law 6 that Patty acted inconsistently with her constitutionally protected right to parent Iliana. Patty's text messages to her mother seeking drugs were clear and convincing evidence that supported Conclusion of Law 6. However, the same conclusion does not necessarily follow for Isaac. Unlike evidence in the Record of Patty's continued drug seeking behavior when she texted her mother seeking drugs, the Record only contains evidence of one instance since February 2017 linking Isaac to participating in marijuana use, aside from his text message exchange about marijuana with Patty.

Evidence that respondents participated in efforts to correct the issues that led to Iliana's removal from their home regarding domestic violence, sobriety, and housing stability, and maintained involvement with Iliana, does not support the trial court's Conclusion of Law 6. Competent evidence did not support findings that Isaac "continue[s] to engage in . . . illegal drug use," particularly since a marked lack of evidence exists in the Record concerning continued drug seeking behavior by Isaac.

Limited marijuana usage, without more, is not conduct inconsistent with one's constitutionally protected parental rights. Since "[t]he clear and convincing standard requires evidence that should fully convince," *In re A.C.*, 247 N.C. App. at 533, 786 S.E.2d at 734, and the Record lacks evidence that fully convinces or supports Conclusion of Law 6, the trial court erred in concluding that Isaac acted inconsistently with his parental rights. Finding of Fact 26 that Isaac acted inconsistently with his parental rights is not supported by competent evidence, should be set aside, and does not support the trial court's Conclusion of Law 6 that Isaac acted inconsistently with his parental rights.

Competent evidence of Patty's continued drug seeking behavior supported the trial court's findings regarding Patty's drug abuse, including Finding of Fact 26 that Patty acted inconsistently with her constitutionally protected right to parent Iliana. These findings supported Conclusion of Law 6 that Patty acted inconsistently with her constitutionally protected right to parent Iliana. Accordingly, I concur with the Majority that we should affirm the trial court's ruling as to Patty.

However, the Record does not contain competent evidence supporting the trial court's findings that Isaac's housing situation, domestic violence, or drug abuse prevented Iliana from returning to live with him. In particular, Finding of Fact 26 that Isaac acted inconsistently with his constitutionally protected right to parent Iliana was unsupported by competent evidence, and the findings did not support Conclusion of Law 6. I acknowledge that further findings would be necessary on

22

remand concerning Iliana's placement with Isaac, as Patty resides with Isaac and continues to exhibit drug seeking behavior.

## **CONCLUSION**

The trial court's Finding of Fact 26 and Conclusion of Law 6 concerning Patty acting inconsistently with her constitutionally protected right to parent the minor child were not erroneous, as the Record contained competent evidence of Patty's continued drug use, and the findings concerning continued drug use supported Conclusion of Law 6.

However, the trial court's Finding of Fact 26 and Conclusion of Law 6 concerning Isaac acting inconsistently with his constitutionally protected right to parent the minor child were erroneous, as the Record did not contain competent evidence of Isaac's continued drug use to the extent inconsistent with his constitutional rights to parent his child, domestic violence, or unsafe housing conditions, and the findings did not support Conclusion of Law 6.

The trial court did not abuse its discretion in its visitation order concerning Patty, as the Order complied with the requirements of N.C.G.S. § 7B-905.1(c).

Unlike the Majority, I would remand this matter for further findings concerning Iliana's placement with Isaac without placing her with Patty. Accordingly, I respectfully dissent.

23